57 CCPA

**Application of John Nicholson GARD-NER, Anthony Maitland Roe and George Lawrence Willey.**

Patent Appeal No. 8311.

United States Court of Customs and Patent Appeals.

June 25, 1970.

Arthur R. Eglington, attorney of record for appellants, George J. Harding, 3rd, Joan S. Keps, Philadelphia, Pa., of counsel.

S. Wm. Cochran, Washington, D. C., for Commissioner of Patents, Leroy B. Randall, Jack Armore, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and FISHER, Chief Judge, Eastern District of Texas, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of claims 1–5, all claims of application serial No. 369,591, filed May 22, 1964, for "Antidepressant Compositions and Methods of Producing Antidepressant Activity."

### The Invention

Claims 1 and 2 are directed to pharmaceutical compositions "having antidepressant activity" and claims 3–5 are directed to a "method of producing antidepressant activity which comprises internally administering" certain compounds. No claim makes any mention of the subject to which the composition or compound is administered, a fact underlying one of the rejections. Underlying another rejection is the fact that the specification nowhere makes any reference to the subject of the administration of the medication, which the Patent Office herein refers to as the "host,"[1] that is to say, the recipient of the medication.

The invention here resided in appellants' alleged discovery of the antidepressant *activity* in 2–aminomethyl–1, 3–benzodioxole compounds. In view of the nature of the rejections, we need not consider these compounds further. No references are relied on. No objection has been made as to the novelty or utility of the compositions claimed or to the novelty or operativeness of the methods claimed, or to the unobviousness of either, and patentability can be assumed provided the specification and claims comply with the statute.

---

[1]. Though we doubt the appropriateness of the term "host" in the context of this case, the medication administered being chemical compounds, we will use it since no one has objected to it. Dorland's Medical Dictionary, 23d Ed. (1955), defines "host" as "An animal or plant which harbors or nourishes another organism (parasite)."

## The Rejections

The rejections before us, as affirmed by the board, are stated in the examiner's Answer as follows:

\* \* \* Claims 3–5 stand rejected as failing to define and particularly point out the invention as required by 35 U.S.C. 112. Claims 3–5 are indefinite in the omission of a host. They are indefinite as *to whom* the "administering" is to.

Claims 1–5 stand rejected as being based on a defective specification in that it fails to teach one skilled in the art *how to use* the invention as required by 35 U.S.C. 112. There is not one specific embodiment of a contemplated host. While dosages are recited on page 6 of the specification and in the claims, they are (1) not related to any host nor (2) are the dosages related to body weight of a host. The question is not one of obviousness, but a failure to "set forth the best mode contemplated" (35 U.S.C. 112).

The examiner's reference to "obviousness" was not the obviousness of the claimed invention but was a reply to appellants' argument that, notwithstanding the total absence from the specification of any mention of a host, it would be obvious to those of ordinary skill in the medical art not only that the host would be a human or other animal but what the dosage should be. After briefly answering appellants' contentions, the examiner concluded his Answer by saying:

The indefiniteness of the claims in the omission of a host clearly follows from the indefiniteness of the disclosure.

In affirming, the board first found that appellants' specification did not contain a disclosure which satisfies the requirements of the first paragraph of 35 U.S.C. 112 and concluded with this paragraph:

In accordance with the foregoing discussion, the rejection of claims 1 through 5 under the first paragraph of 35 U.S.C. 112 must be sustained. The additional rejection of claims 3, 4, and 5 under the first sentence of the second paragraph of 35 U.S.C. 112 does not require any extended additional discussion. Insofar as the disclosure is incomplete regarding the host, such indefiniteness also attaches to claims 3, 4, and 5, but we are not called upon to rule on the propriety of the method claims if the specification were adequate to satisfy the requirements of the first paragraph of 35 U.S.C. 112.

The decision of the Examiner is affirmed.

## The Rejection for Claim Indefiniteness

We will first consider the rejection of claims 3–5 on the ground that they—the claims per se—do not comply with the second paragraph of section 112 because they are indefinite, or, in the examiner's terms, because they do not point out any "host."

We are unable to say whether the board affirmed this rejection. It said it was not called upon to rule on the propriety of claims 3–5 if supported by an adequate specification; at the same time it found the specification inadequate and held that its "indefiniteness," in failing to specify any host and in not relating dosage to any host, "attaches" to claims 3–5. Whether or not the board sustained this rejection, we reverse it. We find the claims definite.

While it is true that there is no reference in any claim to a host, it is entirely clear to us that appellants' invention or discovery was in allegedly finding that the group of compounds here involved possess antidepressant activity. This has not been challenged by the Patent Office. It also seems clear to us that pharmaceutical compositions (i. e., one of the compounds in a suitable pharmaceutical carrier) having *antidepressant* activity would find their primary use as medication for humans with a possibility that they might find some veterinary use in other animals. Appellants say in their arguments—though

not in their application—that while there is no present veterinary use known to them, if one should turn up it would be within their claims. The same observations apply to methods of producing antidepressant activity, as in claims 3–5. We do not find any indefiniteness in any of the claims by reason of their failure to name a host. They are merely broad in this respect and cover the composition and the method when administered or applied to *any* host capable of enjoying the benefits of an antidepressant drug. Breadth is not indefiniteness.

A similar situation obtains with respect to the dosage limitations of the claims. The two composition claims call for dosage units of from about 10 mg. to about 150 mg., and from about 10 mg. to about 100 mg. of the active ingredient, respectively. These ranges are perfectly definite. Claim 3 calls for administering "an effective amount," which, though broad, is not indefinite. Where the invention resides in finding the activity rather than in discovering some critical range or the like, we have approved of such broad definitions of quantity or dosage. In re Caldwell, 319 F.2d 254, 50 CCPA 1464 (1963); compare In re Halleck, 422 F.2d 911, 57 CCPA (1970). Claims 4 and 5 call for "daily dosages" in the ranges 10 to 450 mg. and 10 to 300 mg., respectively. They are enormously wide ranges but there is nothing indefinite about them.

### The Rejection for Inadequate Disclosure

We turn now to the other rejection which is based on the inadequacy of the disclosure under the first paragraph of section 112. Appellants say their invention is in the discovery of the antidepressant *activity* in a group of compounds. They are not claiming the compounds. In effect, by claiming pharmaceutical compositions "having antidepressant activity" and methods "of producing antidepressant activity" which consist in administering the compounds, they are claiming in terms of use. It behooves them, therefore, to disclose how to use, as section 112 ordains, "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to * * * use" their invention. Their invention resides in using drugs to alleviate depression. The question is whether they have disclosed how to do this.

The undisputed fact is that the specification nowhere adverts to any recipient of the antidepressant drugs. Neither man nor beast is mentioned—there is no reference to a host. There are four consecutive paragraphs of the specification and one "example" collectively relating to dosage and administration techniques which can be summarized as saying that the compounds can be put up in all the usual ways, as solids, powders, solutions, and suspensions; in tablets, lozenges, troches, capsules, or ampules; to be administered orally or parenterally; and the carrier may include a time delay material. Whatever the nature of the dosage unit, it may contain anywhere from 10 mg. to 150 mg. of the benzodioxole material and the daily dose, whatever the host, may be from "about 10 mg. to about 450 mg." (With that range, the use of "about" seems somewhat superfluous.) The Patent Office position is that these generalizations are an insufficient disclosure of how to use and do not comply with the law. Appellants say they are sufficient because anyone in the art would, first of all, assume the host to be an average adult human (at the same time keeping open the possibility of veterinary use), that this is not the first antidepressant drug, and that doctors are "given sufficient information to properly administer for example any of the four specific dosage unit forms set forth in Example 18." (That example shows capsules containing 10, 25, 50, and 100 mg. of active ingredient.)

We do not think the disclosure of specific dosage *units*, ranging all the way from 10 mg. to 150 mg., teaches anyone anything about proper dosage. The only significant *dosage* disclosure we find is in the statement about *daily* dosage and

this takes the form of from 10 mg. to 450 mg., a range of from 1 to 45 times. Appellants say:

> One of these dosage *units* may be administered as taught by the specification, *until an antidepressant effect is achieved* especially within the broad *daily dosage* range of from about 10 mg. to about 450 mg. [Emphasis ours.]

Appellants do not say at what point in the process of administering to a patient, say a 10 mg. capsule, an antidepressant effect may be expected in the course of proceeding at some unspecified intervals toward the possible 45th capsule for the day. Nor do they suggest whether it might be better to start off with a 50 mg. capsule or a 150 mg. capsule.

This uncertainty, particularly when coupled with the total absence of any reference to a host, which, in turn, is coupled with an insistence that, within the claimed invention, the host is not necessarily a human being, amounts to a failure, in our judgment, to comply with the requirements of section 112. As we see it, appellants have in effect said to those skilled in the art: Here is a new group of compounds in which we have discovered antidepressant *activity*; you can put them up in convenient dosage units and you can try them out on human patients or animal subjects as you wish and somewhere along the line, from daily doses of from 10 mg. to 450 mg., you will probably get the effect you are after. We consider the range so great as not to be an enabling or how-to-use disclosure as contemplated by the statute. There is not a single specific example or embodiment by way of an illustration of how the invention is to be practiced on any kind of host. We deem it to be in the category of an invitation to experiment in order to determine *how* to make use of appellants' alleged discovery of the antidepressant activity.

Appellants argue:

> The invention here lies in the well known field of antidepressant drugs for which there is a well known standard drug, imipramine. ["Tofranil"]. * * * with imipramine as a standard, a skilled pharmacologist can *test* an antidepressant composition, *such as is claimed here,* in rats for an antagonism of reserpine induced ptosis and picrotoxin potentiation, *and determine the relative potency* of the said antidepressant as compared with imipramine. From this information *he* can determine the doses to be used in humans, that is to say, *if* the new antidepressant is twice as active as imipramine in the rat tests, a typical dose in humans *would be* one-half the normal dose of imipramine. [Emphasis ours.]

In other words, those skilled in the art, by investigations along the above lines, *and by a great amount of work,* can eventually find out how to use appellants' invention. But our view is that the law requires that the disclosure in the application shall *inform* them *how* to use, not how to find out how to use for themselves. The above argument is self-defeating. It demonstrates the inadequacy of the disclosure by saying, in effect: *We* have detected and disclosed the presence of *activity;* if you wish to practice our invention, go and find out how to use it.

Appellants rely on two matters outside the disclosure of their specification to support their argument that it is adequate. In response to an initial rejection under 35 U.S.C. § 101 (not now in issue) that utility of the compounds had not been shown, they filed an affidavit of Willey, one of the applicants, reporting on the efficacy of three of their disclosed compounds in the prevention of reserpine-induced ptosis in rats and the potentiation of picrotoxin-induced convulsions in rats, as well as toxicity data for two of the three compounds in mice. In the letter submitting the affidavit, in response to the first Office Action, appellants also furnished corresponding data on imipramine ("Tofranil"), the known antidepressant drug. The board considered these data and

commented that as a result "we find greater confusion rather than more enlightenment." In criticizing the board's analysis of the data, appellants' brief makes the following comments (all emphasis ours):

> * * * rats, not being human, do not exhibit mental depression. Further, it is clear from the Willey Affidavit that the rat tests reported are of activities *merely indicative* of a antidepressant activity in humans and *not of antidepressant activity* per se. * *

> These tests are relevant only in that reserpine induced ptosis and picrotoxin potentiation in rats have a known correlation with antidepressant activity in man. They are pharmacological tests in nature which are *used to find medicinal agents* for use in man. Thus Willey was not testing for antidepressant activity as such in rats which, in fact, is an impossibility * * *.

> * * * * * *

> Here, as discussed above, where tests were of the related activity type, i. e., antagonism of reserpine ptosis and picrotoxin potentiation but not direct tests of antidepressant activity per se, human doses are *usually not* directly proportional to animal doses. Human doses can only be determined where there is available a standard compound such as imipramine for which there is both a known human dose and known doses from tests in animals such as rats of related activities such as the antagonism of reserpine induced ptosis and picrotoxin potentiation here. In such circumstances, a human dose for a new compound can be determined by obtaining the dose in rats for the related activity of the new compound, establishing an animal dose-activity ratio between the new and old drugs, and then applying the ratio to the human dose of the old drug to obtain the proper dose for the new drug. Thus *if* the new drug is twice as active in animals as the old drug for a given dose, the human dose for the new drug would *most probably* be about 50% of the dose for the old drug.

Now, it is observed that all of this pharmacological, posological (dosage) theory is before us only in the form of unsupported statements by appellants' counsel in their brief. There is nothing of the sort in appellants' specification, which contains neither the theory, the animal data, nor the information about the existence or the properties of the alleged standard antidepressant, imipramine. Far from being persuaded by the above arguments that the disclosure is sufficient, we are more firmly convinced thereby that the Patent Office was correct in ruling that it is not. Appellants have not even shown that it was by pursuing such a theory that they arrived at their daily dosage range of from 10 mg. to 450 mg. nor have we been shown any dosage data on imipramine. There has been no disclosure of any "usual dose" of the claimed compounds or of the antidepressant effect of any *specific* dose on a human being or other animal.

We hold, therefore, that the rejection of all claims for the reason that the specification fails to comply with the first paragraph of 112 was proper and the decision of the board affirming that rejection is affirmed.

Affirmed.