Application of William D. COLIANNI.

Patent Appeal No. 76–735.

United States Court of Customs
and Patent Appeals.

Sept. 15, 1977.

Rehearing Denied Oct. 20, 1977.

Fred S. Lockwood, Chicago, Ill., Lockwood, Dewey, Zickert & Alex, Chicago, Ill., attorney of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Appeals (board) affirming the rejection, under 35 USC § 112, first paragraph, of claims 1–6, which are all the claims present in appellant's application serial No. 200,932, filed November 22, 1971, entitled "Bone Fusing Method." The board's unanimous decision was adhered to on reconsideration, one member dissenting. We affirm.

*Appellant's Disclosure*

To place the issue on this appeal in perspective, appellant's brief application, less formal portions, is reproduced in its entirety:

*Abstract of the Disclosure*

A method of rapidly mending a fractured bone by application of ultrasonic energy thereto at the site of the fracture so as to produce a fusion-like or weld-like mend. The mending action may be assisted by introduction of plastic and/or bone powder at the site of the fracture.

SPECIFICATION

This invention relates to innovations and improvements in the accelerated mending of fractured animal bones by proper application to the fractures of ultrasonic energy.

The object of the invention, generally stated, is the use of ultrasonic energy to mend fractured animal bones, the ultrasonic energy being applied to a bone at the site of the fracture therein so as to produce thereat a fusion-like or weld-like mend.

Certain other more specific objects of the invention will, in part, be obvious and will in part appear hereinafter.

For a more complete understanding of the nature and scope of the invention reference may be had to the following detailed description thereof taken in connection with the accompanying drawings wherein:

Fig. 1 is a diagrammatic elevational view illustrating the manner in which and the apparatus by which my invention may be applied to a fracture in the bone of a living animal; and

Fig. 2 is a sectional view on an enlarged scale taken on line 2–2 of Fig. 1.

The principle underlying the present invention is to in a suitable manner apply sufficient ultrasonic energy to a bone at the site of a fracture therein so that as a result

of the high frequency vibration imparted to the bone sufficient friction is generated at the site so that the resultant effect will be to create a fusion-like or weld-like mend at the fracture. The ultrasonic energy is dissipated at the site of the fracture, being localized at and confined to the fracture. The action is fast and usually ultrasonic energy needs to be applied for less than a minute.

Referring to Figs. 1 and 2, a section of a human forearm is indicated at 5 in broken outline with a length of the ulna bone, for example, indicated at 6 with a fracture therein designated at 7.

By use of appropriate technique selected by the surgeon the hook portions 8 and 10 of a pair of elements 11 and 12 respectively are implanted in the arm so as to hook around the ulna 6 from opposite sides of the fracture 7 and closely adjacent thereto. The elements 11 and 12 may be formed from stainless steel wire having sufficient stiffness to transmit ultrasonic vibrations. The straight end of each of the hook elements 11 and 12 is clamped in the jaws of a Jacobs chuck of the known type used for clamping and holding the ends of drill bits in an electric drill. These clamps are indicated at 13 and 14, respectively, and are carried by ultrasonic generators of known commercial type indicated at 15 and 16, respectively. Such ultrasonic generator units are available commercially in various capacities, e. g. the Sonocone Unit, Powertron Division, Giannini Controls Corp., New York, New York.

With the hook elements 11 and 12 properly implanted and the hook portions 8 and 10 thereof properly attached to the bone 6, and with the shank ends of the elements 11 and 12 properly clamped in the chucks 13 and 14, the ultrasonic generators 15 and 16 may be energized. Depending on the type or character of the fracture 7, it may be necessary to apply pressure to the fracture from opposite sides when the ultrasonic energy is applied. The high frequency vibrations produced by the generators are transmitted through the elements 11 and 12 which vibrate in the direction of the shank portions thereof at a frequency and intensity that depends upon the setting of the generator 15 or 16. The vibrations are transmitted to the broken bone and result in the ultrasonic energy being localized at and confined to the fracture 7. The result is to produce a fusion-like or weld-like mend where the fracture 7 existed.

The mending action produced by the heat friction resulting from the application of ultrasonic energy may be augmented by introducing a suitable orthopedic plastic and/or bone powder to the fracture.

It will be understood that in certain cases it may be advantageous to apply ultrasonic energy to the bone on only one side of a fracture.

The mending action occurs rapidly in a matter of a few seconds to up to a couple of minutes depending upon the intensity of the energy, the nature of the fracture, the rigidity with which the bone is connected to the generator, etc. It will be understood that the intensity or degree of the action must not be such as to appreciably denature the muscle or tissues in the vicinity of the fracture. In other words, the temperature generated by the friction of the bone rapidly vibrating at the fracture under pressure must be localized at the site of the fracture and heat must be rapidly withdrawn from the site of the fracture.

It will be appreciated that in order to apply the invention to different bones and different types of fractures ranging from hair line through compound, a variety of elements or tools may be designed and fashioned for purposes of transmitting ultrasonic energy from the generators to a bone at the site of the fracture therein and that various surgical techniques may be used for attaching or implanting these elements or instruments to the bone on either or both sides of the fracture.

The intensity of the ultrasonic energy and the length of application will depend upon each particular case or fracture but will follow general criteria. The surgeon or operator will evaluate each fracture case and apply the appropriate apparatus and technique. In certain instances it may be

necessary for the surgeon or operator to fashion special tools or instruments and it will be understood that the foregoing description in connection with Figs. 1 and 2 are illustrative of the general principles as well as setting forth one particular manner in which the invention may be practiced.

## WHAT IS CLAIMED AS NEW IS:

1. The method of rapidly mending fractured animal bones which comprises applying sufficient ultrasonic energy by direct mechanical subcutaneous connection to the bone on at least one side of the fracture therein to join the bone together at the fracture.

2. The method of claim 1 wherein ultrasonic energy is applied to the bone on both sides of the fracture adjacent thereto.

3. The method of claim 1 wherein thermoplastic material is introduced into the site of said fracture and is fused on said application of ultrasonic energy and thereafter solidifies.

4. The method of claim 3 wherein bone powder is introduced into the site of said fracture in addition to said thermoplastic material.

5. The method of claim 1 wherein said ultrasonic energy is transmitted to said bone through a pair of hook-like elements having the hook portions attached to the bone.

6. The method of claim 5 wherein said hook-like elements are hooked over opposite sides of said bone with the shank portions thereof extending in approximately opposite directions.

FIG. 1.

FIG. 2.

## OPINION

The board and the examiner rightly questioned the adequacy of appellant's disclosure. The application of "sufficient" ultrasonic energy is essential to appellant's claimed method, yet his specification does not disclose what a "sufficient" dosage of ultrasonic energy might be or how those skilled in the art might make the appropriate selection of frequency, intensity, and duration. There is not a single specific example or embodiment by way of an illustration of how the claimed method is to be practiced. Appellant's specification leaves these matters to "general criteria" (which are left undefined) and states that those wishing to practice his method "will * * apply the appropriate apparatus and tech-

nique," but does not disclose how this would be accomplished. Before the board, in his petition for reconsideration, appellant argued that the "routine way to proceed" would be via *in vivo* experiments with laboratory animals.

The degree of disclosure and the nature of the art in this case are generally parallel to those in *In re Gardner,* 427 F.2d 786, 57 CCPA 1207, 166 USPQ 138 (1970), in which we found the specification not to comply with 35 USC 112, first paragraph. As the dissent points out, there is of record a Russian publication which describes an ultrasonic bone-mending method which was developed via *in vivo* experiments with animals, and in which the parameters for applying the ultrasonic energy are quantified. Other than stating in his brief that the court "may be interested" in this publication, *appellant does not rely on it.* It is not appropriate to comment, as the dissent does, on the effect of that publication on the issue before us.

The decision of the board is *affirmed.*

AFFIRMED.

MILLER, Judge, concurring.

The issue in this case is simple: On this record, has appellant provided sufficient guidelines for one of ordinary skill in the art to practice the claimed invention without undue experimentation? See *In re Stephens,* 529 F.2d 1343, 188 USPQ 659 (Cust. & Pat. App. 1976).

This involves the threshold determination of which party bears the burden of proof on the issue of undue experimentation. In the recent case of *In re Angstadt,* 537 F.2d 498, 190 USPQ 214 (Cust. & Pat.App.1976), a majority of this court asserted that "[s]howing that the disclosure entails *undue* experimentation is part of the PTO's initial burden under [*In re Armbruster,* 512 F.2d 676, 185 USPQ 152 (Cust. & Pat.App.1975)]." *Id.* at 504, 190 USPQ at 219. This, however, would place a difficult, if not impossible, burden on the PTO, which would have

to establish that one of ordinary skill in the art lacks the requisite knowledge to practice the claimed invention by demonstrating that the experimentation required is undue. In the case of an inadequate enabling disclosure, the PTO would have to determine its inadequacies (*e. g.* the guidelines the applicant failed to provide) and then show that these *cannot* be overcome except by undue experimentation. The practical approach, followed consistently by this court prior to *Angstadt,* is to place the initial burden on the PTO to show that the enabling disclosure is not commensurate in scope with the claims. Upon such a showing, the burden of rebuttal shifts to the applicant. *In re Ghiron,* 442 F.2d 985, 992, 58 CCPA 1207, 1215, 169 USPQ 723, 728 (1971); see also *In re Dinh-Nguyen,* 492 F.2d 856, 181 USPQ 46 (Cust. & Pat.App.1974); *In re Marzocchi,* 439 F.2d 220, 223, 58 CCPA 1069, 1073, 169 USPQ 367, 369 (1971); *In re Cook,* 439 F.2d 730, 58 CCPA 1049, 169 USPQ 298 (1971).

The board here questioned appellant's disclosure by noting that there was no "teaching concerning an operative range of the desired frequency of ultrasonic energy, its duration or its intensity." The board also noted that there did not appear to be "any residual knowledge" in the prior art concerning appellant's invention and that the Knoch reference taught that indirect application of high doses of ultrasonic energy could lead to spontaneous bone fractures. Thus, the PTO provided sufficient evidence and reasoning to make a prima facie showing that appellant's disclosure was not commensurate in scope with the claimed invention (which *requires* mending of the fracture). Moreover, Judge Rich's opinion, in stating that "[t]he board and the examiner rightly questioned the adequacy of appellant's disclosure," appears to have abandoned the initial burden test of *Angstadt* and correctly applied the law by shifting the burden to appellant.[1] Appellant, presumably knowledgeable in this particu-

---

1. The dissenting opinion correctly states the PTO's initial burden "of giving reasons, supported by the record as a whole, why the speci- fication is not enabling." The dissent also recognizes that Judge Rich's opinion apparently abandons the *Angstadt* initial burden test.

lar art, did not rebut the PTO's evidence or reasoning. He failed to establish that the knowledge of one skilled in the art was sufficient to enable such a person to practice the claimed invention without undue experimentation.

In determining what constitutes undue experimentation, many factors are to be taken into account. The quality of any necessary experimentation would clearly be undue when "ingenuity beyond that to be expected of one of ordinary skill in the art" is required. *Fields v. Conover,* 443 F.2d 1386, 1391, 58 CCPA 1366, 1372, 170 USPQ 276, 279 (1971). By its reliance on *In re Gardner,* 427 F.2d 786, 57 CCPA 1207, 166 USPQ 138 (1970), Judge Rich's opinion indicates that the *quantity* of necessary experimentation (*i. e.,* "a great amount of work") may be undue. *Id.,* 427 F.2d at 789, 57 CCPA at 1212, 166 USPQ at 141. However, an extended period of experimentation may not be undue if the skilled artisan is given sufficient direction or guidance. *Cf. In re Cook,* 439 F.2d 730, 732, 58 CCPA 1049, 1052, 169 USPQ 298, 300 (1971). Other factors to be considered are the presence or absence of working examples, the nature of the invention, the state of the prior art, the relative skill of those in that art, the predictability or unpredictability of the art, and the breadth of the claims. See *In re Stephens, supra; In re Fisher,* 427 F.2d 833, 839, 57 CCPA 1099, 1108, 166 USPQ 18, 24 (1970); *In re Rainer,* 377 F.2d 1006, 54 CCPA 1445, 153 USPQ 802 (1967); *In re Honn,* 364 F.2d 454, 53 CCPA 1469, 150 USPQ 652 (1966).

On the record before us and taking all of the above factors into account, I cannot agree with the dissenting opinion that enablement commensurate in scope with the claims has been shown. Not a single working example has been disclosed.[2] More importantly, appellant has failed to provide any guidance in selecting operating parameters that would yield the *claimed* result of "mending."[3] All that appellant has disclosed is that "sufficient" ultrasonic energy be applied using "the appropriate apparatus and technique." However, as far as the record shows, there are no established criteria or techniques of which the skilled practitioner would be aware. This case demonstrates the necessity for guidance where the scope of protection sought by the claims is broad. As I pointed out in my dissenting opinion in *In re Angstadt, supra* at 508, 190 USPQ at 222:

> The need for guidance to enable the invention, with its claims to a myriad of combinations  .  .  ., to be practiced without undue experimentation is evident.

*Accord, In re Eltgroth,* 419 F.2d 918, 921, 57 CCPA 833, 837, 164 USPQ 221, 223 (1970); *In re Rainer, supra.*

I agree with the dissenting opinion that the Russian publication is evidence of what one skilled in the art would know as of appellant's filing date. Therefore, it is relevant evidence regardless of whether appellant relies on it. However, as pointed out by the board, the Russian publication does not appear to utilize direct subcutaneous application of ultrasonic energy and, thus, specific operating parameters there dis-

---

**2.** Although "there is no magical relationship between the number of representative examples and the breadth of the claims" with respect to enablement, *In re Borkowski,* 422 F.2d 904, 910, 57 CCPA 946, 952–53, 164 USPQ 642, 646 (1970), and the dissenting opinion correctly points out that "[c]ompliance with 35 USC 112, first paragraph, does not turn on whether a "specific example  .  .  . is disclosed," the lack of a working example is nonetheless a factor to be considered, especially in a case involving an unpredictable and undeveloped art. *Compare In re Stephens, supra* ("The references show that the art is highly advanced, as would be expected for one so ancient.").

**3.** The statement by Judge Rich that appellant's specification does not disclose what a "sufficient dosage of ultrasonic energy might be or how those skilled in the art might make the appropriate selection of frequency, intensity, and duration" and his citation to *Gardner* indicate that guidance must be supplied in a case such as this. As pointed out in *Gardner,* 427 F.2d at 789, 57 CCPA at 1212, 166 USPQ at 141:

> But our view of the law requires that the disclosure in the application shall *inform* [those skilled in the art] *how* to use, not how to find out how to use for themselves.

closed may well be inapplicable to appellant's method. In such an undeveloped and unpredictable area, the publication is entitled to little weight.

LANE, Judge, dissenting, with whom BALDWIN, Judge, joins.

With all due respect, I cannot agree with the majority opinion. Appellant discloses and claims a method of mending fractured animal bones by directly applying ultrasonic energy to the region of the fracture. The Patent and Trademark Office (PTO) board majority expressly stated that it believed appellant's assertion that application of sufficient energy would mend a fractured bone. Thus, given that appellant's method *will* mend bone fractures, the only issue before us is whether appellant's specification is sufficient to enable one of ordinary skill in this art to practice the invention without *undue* experimentation. I believe that it is. The specification discloses ample detail for performing the claimed method. Specifically, stainless steel wire hooks, which extend from known commercial ultrasonic generators, are implanted and attached to one or both sides of the fracture. The high frequency vibrations produced by the generators are transmitted through the hooks to the broken bone and result in ultrasonic energy being localized at, and confined to, the fracture. The result is a fusion-like or weld-like mend where the fracture had been. Appellant's specification states that "[t]he intensity of the ultrasonic energy and the length of application will depend upon each particular case or fracture but will follow general criteria. The surgeon or operator will evaluate each fracture case and apply the appropriate apparatus or technique." As to the duration of application, the specification further states that "[t]he mending action occurs rapidly in a matter of a few seconds to up to a couple of minutes depending upon the intensity of the energy, the nature of the fracture, . . . etc." In addition to appellant's specification, a Russian publication, which was submitted to the PTO by appellant, sets forth specific parameters and discloses definite ranges for these parameters that were found to produce satisfactory results. Since this publication is part of the record, *cf. In re Cofer*, 354 F.2d 664, 53 CCPA 830, 148 USPQ 268 (1966), and was presumably available to one of ordinary skill in this art when appellant's application was filed, it is evidence which may be considered on the issue of enablement. Considering the record as a whole, I am convinced that a person of ordinary skill in this art, viz., the skilled orthopedic surgeon or the skilled veterinarian, would be able to determine by routine experimentation the appropriate intensity and duration of ultrasonic energy needed for any given fracture.

The majority states that "[t]he board and the examiner rightly questioned the adequacy of appellant's disclosure." Mere questioning, however, is not enough; the PTO has the burden of giving reasons, supported by the record as a whole, why the specification is not enabling. At best, the PTO has only pointed out that some experimentation would be required. As a majority of the court stated recently in *In re Angstadt*, 537 F.2d 498, 504, 190 USPQ 214, 219 (Cust. & Pat.App.1976), "this court has never held that evidence of the necessity for *any* experimentation, however slight, is sufficient to require the applicant to prove that the type and amount of experimentation needed is *not* undue." (Emphasis in original.)

The majority further states that "[t]here is not a single specific example or embodiment by way of an illustration of how the claimed method is to be practiced." While it is true that there is no "specific example" which uses "specific" values of frequency, intensity, and duration, it is my view that the majority's emphasis on this point is misplaced. Compliance with 35 USC 112, first paragraph, does not turn on whether a "specific example," or what is commonly referred to as a working example, is disclosed. The test is whether one skilled in the art could practice the claimed invention without undue experimentation. *In re Stephens*, 529 F.2d 1343, 188 USPQ 659 (Cust. & Pat.App.1976); *In re Gay*, 309 F.2d 769,

50 CCPA 725, 135 USPQ 311 (1962). Moreover, even if such a working example were given, it would be of little help since the frequency, intensity, and duration required for other fractures will depend upon sundry factors including, inter alia, the type of fracture, where it is located, how severe it is, etc. Anyone seeking to use the invention to mend a specific fracture, even if it were the same type as one disclosed in an example, would still have to determine by routine experimentation the appropriate values of frequency, intensity, and duration, since these values will vary from case to case.

Appellant has disclosed his invention broadly. In this art, as in *Angstadt,* the performance of trial runs using different frequencies, intensities, and times of exposure is "reasonable," even if the result of each trial is uncertain. The kind of specificity which the majority seems to contemplate is unrealistic in view of the nature of the invention and would have the negative effect of discouraging inventors from filing patent applications in an unpredictable area. The majority seems to want everything predictable in advance, which is impracticable and unreasonable.

Finally, in *Angstadt,* the majority held that "the evidence *as a whole* . . . negates the PTO position that persons of ordinary skill in *this* art, given its unpredictability, must engage in *undue* experimentation . . .. The key word is '*undue,*' not 'experimentation.' " (Emphasis in original.) 537 F.2d at 504, 190 USPQ at 219. I fail to see why this holding should not be dispositive of the case at bar.